[Cite as *In re J.O.*, 2018-Ohio-943.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


In re J.O., A.O., C.O., Aa.O., M.H.

Court of Appeals Nos.  L-17-1235
L-17-1236
L-17-1237

Trial Court No.  JC 15248949
JC 17260801

**DECISION AND JUDGMENT**

Decided:  March 14, 2018

* * * * *

Stephen D. Long, for appellant, M.O.

Laurel A. Kendall, for appellant, P.H.

Bradley W. King, for appellee.

* * * * *

**JENSEN, J.**

## I.  Introduction

**{¶ 1}** This is a consolidated appeal from the August 28, 2017 judgment of the

Lucas County Court of Common Pleas, Juvenile Division, terminating the parental rights

of appellants, M.O. ("mother") and P.H. ("father"), and awarding permanent custody of J.O., An.O., C.O., Aa.O., and M.H. (collectively referred to as the "children") to appellee, Lucas County Children Services ("LCCS").[1]

## A.  Facts and Procedural Background

{¶ 2} On July 13, 2015, LCCS filed a complaint in dependency and motion for shelter care hearing based upon referrals received by the agency concerning mother's mental health deficits, lack of housing, and general lack of supervision of  J.O., An.O., C.O., and Aa.O.  The following day, the juvenile court awarded LCCS interim temporary custody of J.O., An.O., C.O., and Aa.O.

{¶ 3} On August 27, 2015, an adjudicatory hearing concerning J.O., An.O., C.O., and Aa.O. was held before a magistrate.  At the conclusion of the hearing, the magistrate found the foregoing children to be dependent, and awarded temporary custody to LCCS. In her decision, the magistrate found that LCCS had made, and continued to make, reasonable efforts to prevent the continued removal of the children from the home.  The case plan services LCCS provided to mother consisted of a diagnostic assessment, interactive parenting, and housing.  These services were offered to mother with the goal of reunification, and the magistrate ordered mother to comply with said case plan.  The juvenile court subsequently adopted the magistrate's decision.

---

[1] P.H. is the father of M.H.  Ja.O. is the father of the remaining children.  Ja.O. has not filed a notice of appeal and is therefore not a party to this appeal.

2.

**{¶ 4}** Based in part upon its assertion that mother failed to substantially remedy the conditions that caused the removal of J.O., An.O., C.O., and Aa.O. from her home, LCCS filed a motion for permanent custody on December 22, 2016. LCCS alleged that an award of permanent custody was in the children's best interests.

**{¶ 5}** During the pendency of LCCS's motion, M.H. was born. Eleven days later, LCCS filed a motion for permanent custody of M.H., in which LCCS referenced the pending motion for permanent custody of J.O., An.O., C.O., and Aa.O., and noted that father's parental rights had previously been terminated in a case involving M.H.'s sibling. Appellants appeared before the juvenile court for adjudication on LCCS's motion for permanent custody of M.H. on April 28, 2017. At this time, appellants consented to a finding of dependency, and the court found M.H. to be a dependent child. Thereafter, a two-day dispositional hearing was held on LCCS's motions for permanent custody on June 30, and July 6, 2017.

**{¶ 6}** At the dispositional hearing, LCCS called several witnesses. As its first witness, LCCS called Dr. Michael Neverauskas. Dr. Neverauskas has been the children's family doctor for the last five years, during which time he treated An.O., J.O., and C.O., and Aa.O. Aa.O. was subsequently taken to a different provider by her foster mother.

**{¶ 7}** As the children's family doctor, Dr. Neverauskas testified that C.O. was of normal mental capacity, but that An.O. and J.O. have "some mental disabilities." He went on to indicate that he has seen An.O., J.O., and C.O. more often since they were placed into foster care. Dr. Neverauskas also observed that the children seemed to be doing better in the foster care environment, which he described as "more structured and

3.

not as chaotic." Dr. Neverauskas testified that he was concerned about mother and Ja.O.'s lack of attention to the children's medical needs. Nevertheless, Dr. Neverauskas acknowledged on cross examination that the children were clean and appeared to be properly fed while under mother's care.

{¶ 8} Next, LCCS called Sheila Irwin to the stand. Irwin is the foster mother for C.O. and An.O. Irwin was also the foster mother to Aa.O. and J.O. until they were removed from her care four months prior to the hearing, following an incident in which Aa.O. reported that J.O. had "been messing with her butt." Irwin testified that she would be interested in adopting J.O., An.O., and C.O. Irwin stated that her daughter was interested in adopting Aa.O. and M.H.

{¶ 9} On direct examination, Irwin testified that An.O., Aa.O., and J.O. are enrolled in special education classes. She also stated that C.O. and An.O. are receiving mental health services. Irwin explained that An.O.'s services were more intensive than C.O.'s because An.O. was inappropriately touched while he was residing at a homeless shelter with mother and Ja.O. The family was forced into the shelter after being evicted from an apartment following a disagreement with the landlord over a $50 increase in the monthly rent, which she refused to pay. While she was pregnant with M.H., mother told Irwin that she "takes a little bit of liquor drink." Mother also discussed an incident with Irwin in which father choked her because he thought that she had lost some of his marijuana. Mother went on to inform Irwin that father was a marijuana dealer and that he sometimes sold the drugs out of the residence where the children were residing. Indeed, Irwin testified that mother's nickname for father was "dope man."

4.

{¶ 10} During cross examination, Irwin stated that she had no concerns regarding mother's care of the children. Notably, Irwin acknowledged that she and mother are "really good friends."

{¶ 11} At the conclusion of Irwin's testimony, LCCS called its caseworker, Lauri Wolfe, who was assigned to this case by the agency in June 2016. According to Wolfe, LCCS's history with mother and Ja.O. dated back to 2009, but the agency became involved in this case in April 2015 due to the parents' lack of supervision of the children.

{¶ 12} By the time Wolfe took the case over, mother had completed parenting services and was engaged in mental health services, but concerns remained regarding her ability to demonstrate appropriate parenting skills. Moreover, mother's attendance at her weekly mental health visits was sporadic. Mother expressed to Wolfe that she would engage in mental health services to the extent she deemed appropriate. Although she was informed that further participation in mental health services could make her eligible for additional services to assist her with the children, mother refused to engage and stated that she did not want to be "labeled."

{¶ 13} Additionally, mother tested positive for marijuana during a drug screen in November 2016. Mother was pregnant with M.H. at the time of her drug screen. Subsequent drug screens have been negative, but mother refused to attend "AOD group," which was part of her case plan services according to Wolfe. Mother's failure to complete her drug services precluded her from engaging in domestic violence services as required under her case plan. Concerning the domestic violence incident that involved

5.

father choking mother, Wolfe testified that mother excused father's conduct by stating that he was so drunk that he blacked out and did not know what he was doing.

{¶ 14} Regarding father, Wolfe indicated that LCCS was concerned about his criminal history, which included domestic violence and drug charges. LCCS was also concerned about father's lack of compliance with case plan services in a prior case that resulted in the termination of his parental rights with respect to another child. Given the prior termination of father's parental rights, LCCS informed father that it would be seeking original permanent custody of M.H. upon her birth. Consequently, father was not placed on a case plan and was not offered services through LCCS. Nonetheless, Wolfe encouraged father to engage in services to address his substance abuse issues. To that end, father submitted one urine screen in July 2016, which tested positive for THC. Father refused to submit any further urine screens, despite being asked to do so by Wolfe on at least four occasions.

{¶ 15} Concerning the children, Wolfe testified regarding several mental health concerns. First, Wolfe indicated that J.O. was diagnosed with autism, mild mental retardation, and depressive disorder. According to Wolfe, J.O. has made progress with his special needs in his foster home and is currently doing well. An.O. was diagnosed with oppositional defiant disorder after he reported that a man "touched him and messed with him while the family was in the shelter." C.O. is the highest functioning of the children, and Wolfe stated that he was diagnosed with depressive disorder. Aa.O. was diagnosed with an anxiety disorder and is on growth hormone injections. Wolfe reported that Aa.O. is doing well in her foster home. Finally, M.H. was born with Down

6.

Syndrome and has physical and cognitive delays that are being addressed in the Help Me Grow program. As with the other children, Wolfe testified that M.H. was doing well with her foster placement.

{¶ 16} In light of the children's special needs, mother's involvement with father despite a history of drug use and domestic violence, and mother's inadequate housing, Wolfe testified that an award of permanent custody of the children to LCCS was in the children's best interests. When asked about the possibility of the children being exposed to mother and father in the event that Irwin and her daughter adopted the children, Wolfe stated that she liked that idea since mother and father visited the children with "near perfect regularity."

{¶ 17} On cross examination, Wolfe acknowledged that mother had completed most of her case plan services and was generally compliant. Further, Wolfe agreed that mother and father routinely visited the children and that their interaction with the children was appropriate during the visits.

{¶ 18} At the close of Wolfe's testimony, LCCS rested subject to calling the children's guardian ad litem at the close of all testimony. Thereafter, mother took the stand. Regarding her housing situation, mother explained that she was paying $600 on a month-to-month lease when her landlord informed her that he was raising her rent by $50. Mother then directed her mother, who was living with her at the time, not to pay the increased rent, which resulted in the family being evicted from the apartment. Subsequently, appellants moved into a three-bedroom residence where they pay $500 per month for rent. Mother cares for her mother, who also resides in the apartment.

7.

{¶ 19} As regards mother's lack of participation in group substance abuse counseling, mother testified that she attempted to complete the counseling but found that she did not prefer the group setting. Mother stated that "as soon as the groups started getting bigger, I just backed down and started doing it all on my own." Mother indicated that she was under the impression that she was in compliance with her substance abuse services, and stated that LCCS had not informed her otherwise.

{¶ 20} Father was the next witness to take the stand. In general, father testified that he was capable of providing appropriate care for M.H. Father indicated that he has been employed as a nurse's aid at a group home owned by his aunt for over five years. He stated that the three-bedroom apartment that he and mother lived in could be renovated in order to add another bedroom. The children's guardian ad litem questioned how father could add a third bedroom given the small size of the apartment.

{¶ 21} Regarding father's alleged domestic violence, father admitted that he could not remember his actions because he was intoxicated. He further acknowledged committing acts of domestic violence toward the mother of his previous child. Nonetheless, father testified that he did not exhibit a pattern of domestic violence. Moreover, father agreed that he would be willing to engage in domestic violence classes in order to alleviate any concerns LCCS may have concerning his history of violence. Father went on to state that he underwent a mental health assessment one day prior to the hearing. Father explained that it took him several months to obtain health insurance, which precipitated his delay in obtaining a mental health assessment for this case.

{¶ 22} The children's guardian ad litem was called to the stand by LCCS following father's testimony. The guardian's report, which contained a recommendation of permanent custody to LCCS, was introduced into evidence and referenced during the guardian's testimony. In explaining her findings, the guardian testified that mother had not remedied the problems that brought about the removal of the children from the home. She went on to state that mother did not appear to recognize her mental health issues or the severity of the issues facing the children.

{¶ 23} At the conclusion of the hearing, the juvenile court issued its judgment entry in which it found that J.O., An.O., C.O., and Aa.O. had been in LCCS's custody for 12 or more months of a consecutive 22-month period under to R.C. 2151.414(B)(1)(d). The court further found that M.H. was placed in LCCS's permanent custody pursuant to R.C. 2151.353(A)(4) because she could not and should not be placed with mother or father within a reasonable period of time and permanent custody was in her best interest under R.C. 2151.414(D)(1). The court went on to find that LCCS was not required to make reasonable efforts to prevent the removal of M.H. from father because father previously had his parental rights involuntarily terminated with regard to M.H.'s sibling. Moreover, the court found that father failed to demonstrate that he could provide a legally secure permanent placement and adequately care for M.H. notwithstanding the prior termination of his parental rights.

{¶ 24} Although LCCS was not required to make reasonable efforts concerning father, the court found that LCCS did make reasonable efforts by encouraging father to

9.

participate in services, but father failed to utilize the services. Instead, father submitted one drug screen that tested positive for marijuana and refused to provide any additional drug screens or engage in substance abuse services.

{¶ 25} The court also found that LCCS made reasonable efforts toward reunification with mother by offering her case plan services. Notwithstanding these case plan services, the court found that mother failed to remedy the conditions causing the children to be placed outside the home under R.C. 2151.414(E)(1). After acknowledging the fact that mother participated in many of the case plan services that she was offered, the court determined that she failed to make any significant changes since LCCS initiated this case.

{¶ 26} In support of its finding under R.C. 2151.414(E)(1), the court noted mother's denial of any safety concerns for the children, including the J.O.'s inappropriate sexual behavior, as well as her continued relationship with father despite his history of domestic violence and substance abuse. Additionally, the court found that mother's housing situation, which was one of the causes of the children's removal, continued to be problematic in that the three-bedroom apartment was too small for the children and lacked appropriate safety precautions to address the children's sexual behavior. The court went on to describe mother's utilization of mental health services as minimal, and expressed concern over mother's consumption of alcohol and marijuana while she was pregnant with M.H. Finally, the court found that mother did not take advantage of all the resources that were made available to her, including a cash-assistance benefit through the Board of Developmental Disabilities.

10.

**{¶ 27}** After concluding that the children could not and should not be placed with mother or father within a reasonable period of time, the court moved on to a consideration of the children's best interests under R.C. 2151.414(D)(1). The court again noted that J.O., An.O., C.O., and Aa.O. had been in LCCS's custody for 12 or more months. The court also found that the children made significant improvements while in LCCS's custody, and that their needs for a legally secure permanent placement could not be met without a grant of permanent custody to LCCS. Concerning father, the court reiterated the prior termination of parental rights. Finally, the court noted that the children's guardian ad litem concluded that permanent custody to LCCS was in the children's best interests.

**{¶ 28}** In light of the foregoing findings, the juvenile court granted LCCS's motion for permanent custody. Mother and father filed timely notices of appeal, and the matter was consolidated sua sponte on October 13, 2017.

### B. Assignments of Error

**{¶ 29}** On appeal, mother asserts the following assignment of error:

> The trial court erred in granting appellee Lucas County Children Services Board's motion for permanent custody as the decision was against the manifest weight of the evidence.

**{¶ 30}** In addition, father asserts the following assignments of error:

> I. The trial court committed reversible error when it held that appellee did not have to make reasonable efforts to reunify the family herein based on a prior termination of father's parental rights for a sibling

of M.H., when LCCS invited father to participate in services for a case in which he was not a party, thereby waiving the right to refuse reasonable efforts.

II. The trial court's finding that the agency made reasonable efforts to reunify the child herein, when father was not offered any case plan services for his own child, and when the court is required to explain the facts upon which it based its determination in regard to reasonable efforts, is against the manifest weight of the evidence.

## II. Analysis

### A. Mother

{¶ 31} In mother's sole assignment of error, she argues that the juvenile court's award of permanent custody to LCCS was against the manifest weight of the evidence.

{¶ 32} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167, 03AP-1231, 2004-Ohio-3312, ¶ 28. In conducting a review on manifest weight, the reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17. We recognize that, as the

12.

trier of fact, the trial court is in the best position to weigh the evidence and evaluate the testimony. *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). Thus, "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3, 461 N.E.2d 1273 (1984).

{¶ 33} Here, the juvenile court found that J.O., An.O., C.O., and Aa.O. had been in LCCS's temporary custody for 12 or more months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d). Mother acknowledges that the children had been in LCCS's temporary custody for more than 12 months on December 22, 2016 (the date that the motion for permanent custody was filed). However, she contends that the court erred in relying upon R.C. 2151.414(B)(1)(d) because the children had not been removed from mother's home for at least 22 months as of that date.

{¶ 34} In support of her argument, mother cites our decision in *In re E.P.*, 6th Dist. Wood No. WD-09-070, 2010-Ohio-3529, ¶ 58, where we held that the juvenile court's finding under R.C. 2151.414(B)(1)(d) was not supported by clear and convincing evidence where the child was in temporary custody for at least 12 months, but the 22-month consecutive time period was not complete at the time the agency filed its permanent custody motion. *But see In re T.B.*, 9th Dist. Summit No. C.A. 21124, 2002-Ohio-5036, ¶ 23 ("There is nothing in the plain language of [R.C. 2151.414(B)(1)(d)] that requires a public agency to wait until a child has been in its custody for twenty-two months before filing a motion for permanent custody."); *In re I.D.*, 7th Dist. Columbiana

13.

No. 09 CO 13, 2009-Ohio-6805, ¶ 50 ("[T]he twenty-two consecutive month requirement in the '12 of 22' provision does not prevent a court from granting permanent custody of a child under twenty-two months of age who has been in the permanent custody of the agency for at least twelve months."); *In re N.R.*, 12th Dist. Butler No. CA2007-12-314, 2008-Ohio-1993, ¶ 18 (upholding the juvenile court's finding under R.C. 2151.414(B)(1)(d) where the children were only in the agency's temporary custody for 21 months at the time the motion for permanent custody was filed).

{¶ 35} In *In re E.P.*, we went on to state that the juvenile court's erroneous finding was not fatal so long as a ground other than R.C. 2151.414(B)(1)(d) existed to support a grant of permanent custody. In the present case, the juvenile court also found that the children could or should not be placed with their parents within a reasonable time under R.C. 2151.414(B)(1)(a). Admittedly, the court did not explicitly reference R.C. 2151.414(B)(1)(a) in its entry. However, the court's reliance on the statute is evident from the fact that it considered the factors contained in R.C. 2151.414(E), which guide the court's determination of whether a child could or should be placed with either parent within a reasonable period of time. Notably, mother acknowledges in her appellate brief that the juvenile court "appears, in its judgment entry, to have proceeded as if R.C. 2151.414(B)(1)(a) was the basis of the permanent custody." At the conclusion of the dispositional hearing, the juvenile court explained its decision, stating:

> Pursuant to section 2151.414(B)(1)(d), even without any issues
> regarding the (E) components, I could find that the children just based on

14.

that section, since they've been in care at the time of filing of the motion for permanent custody * * * for more than 12 out of the previous 22 months that an award of permanent custody is affirmed – you know, supported.

However, looking at the (B)(1)(a) and (E)(11) factors, I do find that the choices that mom has made, which I just discussed, * * * I do find that an award of permanent custody to the Agency is supported by clear and convincing evidence.

{¶ 36} In light of the juvenile court's application of R.C. 2151.414(B)(1)(a) in addition to R.C. 2151.414(B)(1)(d), the juvenile court's application of the 12 of 22 month rule was not fatal in this case.

{¶ 37} If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider whether granting permanent custody to the agency is in the children's best interest and whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.*, 6th Dist. Lucas No. L-10-1053, 2010-Ohio-3329, ¶ 43. If the court finds that at least one factor in R.C. 2151.414(E) applies, it must then determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1).

{¶ 38} In this case, the juvenile court found that mother failed to remedy the conditions causing the children to be placed outside the home under R.C. 2151.414(E)(1). The court supported its finding by referencing mother's denial of any safety concerns for

15.

the children, including J.O.'s inappropriate sexual behavior, as well as her continued relationship with father, who had committed at least one prior act of domestic violence toward her and was selling drugs out of the home. Additionally, the court found that the three-bedroom apartment in which mother was residing with father and mother's mother was not suitable for the children. The court reasoned that the apartment was too small to allow the children to be separated, which would be necessary in order to address the children's inappropriate sexual behavior. In further support of its determination that mother failed to remedy the conditions that led to the removal of the children, the court noted mother's minimal utilization of available mental health services and her consumption of alcohol and marijuana while she was pregnant with M.H.

{¶ 39} Having reviewed the record in its entirety, we find that the foregoing facts that were cited by the juvenile court support its determination that mother failed to remedy the conditions causing the children to be placed outside the home under R.C. 2151.414(E)(1). Therefore, we find that the juvenile court's determination under R.C. 2151.414(E)(1) was not against the manifest weight of the evidence.

{¶ 40} Turning now to the juvenile court's best-interest determination, R.C. 2151.414(D)(1) requires the court to consider all relevant factors, including:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

16.

(b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c)  The custodial history of the child * * *;

(d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶ 41}** Under R.C. 2151.414(D)(1)(a), the record reveals that the children made significant improvements while in LCCS's custody and were bonded with their foster parents.  This finding is supported by the testimony of several witnesses, including mother, who acknowledged that her children's behavior had improved while in foster care to the point that she did not even recognize them.  Concerning R.C. 2151.414(D)(1)(b), the children's guardian ad litem concluded that permanent custody to LCCS was in the children's best interests.  Moreover, the custodial history of the children supports the juvenile court's best interest determination under R.C. 2151.414(D)(1)(c).  Indeed, J.O., An.O., C.O., and Aa.O. had been in LCCS's custody for 12 or more months at the time of the dispositional hearing, and M.H. was placed into LCCS custody upon birth.  Under R.C. 2151.414(D)(1)(d), the court also determined that the children's need for a

17.

legally secure permanent placement could not be met without a grant of permanent custody to LCCS. R.C. 2151.414(D)(1)(e) does not apply here since the factors in R.C. 2151.414(E)(7) to (11) are inapplicable to mother.

{¶ 42} In light of the foregoing analysis, we find that the juvenile court's determination that an award of permanent custody to LCCS was in the children's best interest was not against the manifest weight of the evidence, but, rather, was supported by competent, credible evidence. Having already upheld the court's determination under R.C. 2151.414(E)(1), we find that the court's termination of mother's parental rights was not against the manifest weight of the evidence. Accordingly, mother's sole assignment of error is not well-taken.

## B. Father

{¶ 43} In father's first assignment of error, he argues that the juvenile court committed reversible error when it held that appellee did not have to make reasonable efforts to reunify the family based on a prior termination of father's parental rights for a sibling of M.H. Father contends that LCCS waived its right to seek permanent custody of M.H. without making reasonable efforts when it encouraged father to participate in services.

{¶ 44} Under R.C. 2151.419(A)(2)(e), the juvenile court was required to find that LCCS was not required to make reasonable efforts to prevent the removal of M.H. from father's home because father has had parental rights involuntarily terminated with respect M.H.'s sibling. The statutory language is mandatory, and we see no support for father's

18.

novel waiver argument. Father's argument would force LCCS to refuse services to a parent who has had his or her parental rights previously terminated or risk waiving the application of R.C. 2151.419(A)(2). To limit the extent to which an agency such as LCCS can offer its services to a parent in pursuit of reuniting the parent with his or her child seems cruel and nonsensical. Therefore, we reject father's waiver argument and find father's first assignment of error not well-taken.

{¶ 45} In his second assignment of error, father argues that the juvenile court's finding that the agency made reasonable efforts to reunify M.H. was against the manifest weight of the evidence. We reject this argument outright because, as noted above, father has previously had his parental rights terminated with regard to M.H.'s sibling and, consequently, LCCS was not required to make reasonable efforts to prevent M.H.'s removal. Further, we find no merit to father's contention that the juvenile court's finding is against the manifest weight of the evidence. Indeed, the record reveals that father was encouraged to complete case plan services that were offered to father in his prior case involving M.H.'s sibling. Father also submitted one drug screen in this case that tested positive for marijuana and then refused to engage in any further substance abuse services or drug screens.

{¶ 46} Ultimately, LCCS made reasonable efforts in this case despite being under no obligation to do so. Father failed to take advantage of those services, or to make himself available to LCCS caseworkers. Accordingly, father's second assignment of error is not well-taken.

19.

### III.  Conclusion

**{¶ 47}** For the foregoing reasons, the judgment of the Lucas County Court of

Common Pleas, Juvenile Division, is affirmed.  Appellants are ordered to pay the costs of

this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.       _____
                          JUDGE

Arlene Singer, J.        _____

James D. Jensen, J.               JUDGE
CONCUR.

                     _____
                          JUDGE

20.